UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STEVEN R. GARITY,

    Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

    Defendant.

CASE NO.   C04-5554RJB

REPORT AND RECOMMENDATION

Noted for July 8, 2005

Plaintiff, Steven R. Garity, has brought this matter for judicial review of the denial of his application for disability insurance benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff was born on June 15, 1954. Tr. 72. He has a high school education and has completed some college-level classes. Tr. 422. He has past work experience as a longshoreman, maintenance janitor, surveyor, cashier, stocker, and construction worker. Tr. 458-59.

On December 29, 2000, plaintiff filed an application for disability insurance benefits, alleging disability as of January 1, 1994, due to a torn right rotator cuff, right elbow problems, a spinal birth defect, and polymyalgia rheumatica. Tr. 72, 80.  On January 2, 2004, plaintiff amended his alleged onset date of disability to November 13, 2000, adding mental impairments to his list of allegedly disabling conditions. Tr. 388.  Plaintiff's application was denied initially and on reconsideration. Tr. 34-39, 42-44.

Plaintiff requested a hearing, which was held before an administrative law judge ("ALJ") on February 6, 2003. Tr. 414.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 414-72.  On October 30, 2003, the ALJ determined plaintiff to be not disabled, specifically finding in relevant part that:

(1) at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity;

(2) at step two, plaintiff had "severe" impairments consisting of polymyalgia rheumatica, a chronic pain disorder, an adjustment disorder, degenerative disc disease, varicose veins, lateral recess stenosis, and mild scoliosis;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) at step four, plaintiff retained the residual physical capacity to perform a modified range of light work, which precluded him from performing his past relevant work; and

(5) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 31-33. Plaintiff's request for review was denied by the Appeals Council on August 12, 2004, making the second ALJ's decision the Commissioner's final decision. Tr. 1, 7-10; 20 C.F.R. §§ 404.981.

On September 1, 2004, plaintiff filed a complaint with this court seeking judicial review of the second ALJ's decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a) the ALJ improperly evaluated the medical evidence in the record;

(b) the ALJ erred in assessing plaintiff's credibility;

(c) the ALJ's assessment of plaintiff's residual functional capacity is not supported by substantial evidence; and

(d) the record supports a finding of disability at step five of the disability evaluation process.

For the reasons set forth below, the undersigned recommends the ALJ's decision be affirmed.

REPORT AND RECOMMENDATION
Page - 2

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.  The ALJ Properly Evaluated the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, therefore, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

1 legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the
2 ALJ "need not discuss *all* evidence presented" to him or her.  <u>Vincent on Behalf of Vincent v. Heckler</u>, 739
3 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain
4 why "significant probative evidence has been rejected." <u>Id.</u>; see also <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07
5 (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

6     In general, more weight is given to a treating physician's opinion than to the opinions of those who
7 do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of
8 a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."
9 <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th
10 Cir. 2001); <u>Magallanes</u>, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight
11 than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A nonexamining physician's
12 opinion may constitute substantial evidence if "it is consistent with other independent evidence in the
13 record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

14     A.    <u>Dr. Stirling</u>

15     Plaintiff argues the ALJ did not provide valid reasons for rejecting the assessment of limitations
16 provided by his treating physician, Dr. Brynn Sterling, in a state physical evaluation form, date June 18,
17 2001.  In that form, Dr. Stirling stated that plaintiff would be "able to physically do light to sedentary work,
18 but not for a full work day."  Tr. 220.  After setting forth a lengthy analysis of the medical evidence in the
19 record (Tr. 18-28), the ALJ rejected Dr. Stirling's assessment, stating in relevant part:

20     Dr. Stirling found limitations varying from sedentary to light that were apparently based
21     on the claimant's reports to him.  Little objective medical evidence is provided to
    support his opinion . . .

22     Dr. Stirling appears to have accepted the claimant's statements that he could not
    perform work activities for a full work day.  As discussed above, the record as a whole
23     does not establish that the claimant would have difficulties performing work activities on
    a regular and continuing basis within his exertional abilities.
24
Tr. 27-28.  The undersigned finds these reasons to be valid and supported by substantial evidence.
25
26     Plaintiff asserts, however, that the record does contain objective medical findings.  While it is true
27 that the record contains objective medical findings, there is a clear difference between objective medical
findings and objective medical findings indicative of a disabling condition.  Thus, although Dr. Stirling's
28 examination reports do contain objective medical findings, those findings do not support his opinion that

REPORT AND RECOMMENDATION
Page - 4

1  plaintiff is unable to perform full-time work.

2  For example, although plaintiff did have some pain and tenderness on examination in mid-June 2001,
3  his muscle strength was symmetrical and largely intact. Tr. 216.  Dr. Stirling, furthermore, stated in the
4  evaluation form that plaintiff would be unable to work full-time for at most twelve weeks and thought that
5  he might improve with treatment. Tr. 216, 220.  See 42 U.S.C. § 423(d)(1)(A) (to be disabled claimant must
6  be unable to engage in any substantial gainful activity due to physical or mental impairment which can be
7  expected to last for a continuous period of not less than twelve months).  Dr. Stirling also found no
8  indications of limitation with respect to agility, mobility or flexibility. Tr. 220.

9  Subsequent examinations performed by Dr. Stirling failed to reveal significant physical functional
10 limitations as well.  In late March 2002, Dr. Stirling noted prednisone had been "successful" in relieving
11 plaintiff's symptoms. Tr. 302.  In early August 2002, Dr. Stirling found that there was "nothing remarkable
12 about" plaintiff's examination. Tr. 296.  Plaintiff reported in late September 2002, that his joint pains and
13 myalgias had "improved." Tr. 295.  During this time period, Dr. Stirling did make diagnoses of chronic
14 pain, fibromyalgia, polymyalgia rheumatica, and inflammatory arthritis, but little in the way of supporting
15 objective medical findings indicating a disabling condition accompanied those diagnoses. See Tr. 219, 296,
16 299, 302, 306-07, 372, 374.

17 The majority of the remaining objective medical findings in the record support the ALJ's findings as
18 well.  An examination of plaintiff during a visit to the emergency room in mid-November 2000, was largely
19 unremarkable. Tr. 189-90.  He was in only mild discomfort, with a moderate degree of pain and no
20 tenderness. Tr. 188-89.  He had intact range of motion, normal extremities and joint stability, and no joint
21 swelling or effusion. Tr. 190.  In late November 2000, Dr. David V. Williams noted plaintiff's symptoms
22 had "resolved within 24 hours of starting" treatment with prednisone. Tr. 193.  In mid-December 2000, Dr.
23 Williams again noted that plaintiff was "doing fine" on the prednisone. Id.

24 Dr. Frederick A. Jensen's late February 2001 neurological examination of plaintiff was essentially
25 normal. Tr. 227.  Specifically, plaintiff had normal muscle strength and gait, with no sensory deficits. Id.  He
26 had full range of motion in his wrists and hips, with only a mild reduction in shoulder range of motion. Id.
27 His knees were stable as well. Id.  While Dr. Jensen diagnosed plaintiff with inflammatory arthritis, he noted
28 plaintiff's symptoms were "mild" and felt "his disease" might be "transient" in nature, considering "the

1  paucity of the findings." Id.  In early March 2001, Dr. Jensen again reported that there did "not appear to be
2  a very active disease process," that there were "no objective physical findings," and that plaintiff had
3  "relatively mild symptoms of shoulder stiffness." Tr. 228.

4  Also in early March 2001, an examination performed by Dr. Rebecca Houseman again was almost
5  entirely normal. Tr. 206-09.  Plaintiff was able to get on and off the examining table "without difficulty,"
6  was able to take his shoes off, and could walk on his toes and heels and stand alternately on one foot. Tr.
7  206-07.  His gait was normal, his straight leg raising was "completely negative," and he had no muscle
8  spasm, tenderness, crepitus, effusion, deformities, trigger points, or edema. Tr. 207-08.  Plaintiff had "[f]ull
9  body rotation," normal grip and motor strength, and his sensation was intact. Tr. 208.  He had no muscle
10 atrophy or weakness and full range of motion. Tr. 208-09.  In terms of functional limitations, Dr. Jensen
11 found "no evidence of limits in his ability to lift, carry, stand, walk, or sit," and "no evidence of postural
12 limitations, manipulative limitations, or restrictions of special senses." Tr. 209.

13 Dr. Sally M. Ehlers noted plaintiff to be in no acute distress in late March 2001, and Dr. Jensen
14 found "no stigmata of active inflammatory joint disease" in mid-April 2001. Tr. 210, 229.  In early July
15 2001, Dr. Jensen found "no tenderness of the fibromyalgia tender points," synovitis or deformities. Tr. 230.
16 Plaintiff also had full joint range of motion. Id.  Later that month, while Dr. Jensen felt plaintiff would be
17 limited to sedentary work, he again noted the lack of "physical evidence of active inflammation," and of any
18 indications of limitation on agility, mobility or flexibility. Tr. 232.  In early October 2001, Dr. Jensen did
19 find plaintiff "had some difficulty with myalgias," but could not "elicit symptoms that would suggest an
20 acute inflammatory arthropathy." Tr. 323.  Further, although plaintiff appeared to have "mild" scoliosis and
21 "a few small" bone spurs, Dr. Jensen did not see any "physical or laboratory evidence of a disabling
22 inflammatory disease process." Id.

23 Substantially similar findings were produced during Dr. Dennis F. Smith's examination of plaintiff in
24 mid-October 2001. Tr. 285-86.  Although plaintiff reported diffuse tenderness throughout his extremities
25 and low back, Dr. Smith made the following observations:

> The patient moves easily about the exam room, in fact, he seems to fidget and pace
> about more than would be expected for a person complaining of musculoskeletal pain.
> Inspection of the patient's upper extremities, lower extremities and spine show no visible
> swelling, no erythema, no ecchymosis, no deformity, no palpable masses, no rashes and
> no scars.

Tr. 285. Plaintiff had no joint effusion and exhibited full range of motion in his extremities without any instability, albeit with complaints of pain. Tr. 285-86. Thus, Dr. Smith was "unable to find any evidence on physical exam of specific anatomic abnormality," and, for that reason, he did not feel that any specific orthopedic treatment would provide plaintiff with any particular benefit. Tr. 286.

Although plaintiff reported complaints of pain during a physical examination performed by Dr. Margo Newell-Eggert in late October 2001, major motor strength testing of his upper and lower extremities was grossly intact. Tr. 354. Plaintiff also had "questionable" neck weakness. Id. An examination by Dr. Tom Hecht in late November 2001, revealed normal strength and manual motor functioning, without any muscle atrophy. Tr. 349. Plaintiff exhibited essentially normal sensation as well. Id. Dr. Hecht therefore found no evidence of myopathy or myositis. Id.

Dr. Smith examined plaintiff again in early December 2001. He noted plaintiff moved "frequently about the exam room" and did "not appear to be in any distress." Tr. 283. Examination of plaintiff's upper and lower extremities revealed no visible swelling, erythema, ecchymosis, deformity, or muscle atrophy. Id. Although plaintiff had diffuse tenderness and pain with motion, there was no evidence of elbow joint effusion or shoulder instability, and he had intact color, capillary refill and pulses in his upper extremities. Id. Because plaintiff's examination still showed "no musculoskeletal, anatomic orthopedic pathology," Dr. Smith "would not suggest any orthopedic surgical intervention," unless additional MRI scanning uncovered a specific problem. Tr. 284.

Plaintiff was examined by Dr. Smith once more in late December 2001. Plaintiff was not in any distress and was "able to ambulate easily about the exam room with no limp." Tr. 281. Inspection of his upper extremities again failed to reveal any deformity, muscle atrophy or other abnormality. Id. Despite complaints of pain with motion, he appeared to have full range of motion in his shoulders and elbows. Id. Although plaintiff also had some dysesthesia in his upper extremities, his sensation was intact and there was no electrodiagnostic evidence of a rotator cuff tear. Id. Other than some mild rotator cuff tendinosis expected for people of plaintiff's age, he had "no other significant abnormality." Id. Thus, Dr. Smith did not consider plaintiff's "mild degree of impingement" to be of any significance." Id. As such, Dr. Smith found "no evidence of surgically correctable abnormality," and therefore did not believe plaintiff "would be benefitted by any form of orthopedic intervention." Tr. 282.

1   In a letter to Dr. Spirling, dated May 22, 2002, Dr. Newell-Eggert reported that plaintiff told her his
2   medications helped with his pain. Tr. 340. On examination, he was noted to be in no apparent distress, with
3   full muscle strength and intact sensation in both his upper and lower extremities. Tr. 341. Major muscle
4   testing performed by Dr. Newell-Eggert in late July 2002, again revealed full muscle strength in plaintiff's
5   lower extremities and intact sensation. Tr. 334. He also had "fairly good" range of motion in his lumbar
6   spine. Id. Another examination performed by Dr. Newell-Eggert in late November 2002, produced
7   substantially similar findings, although plaintiff had pain to palpation in his thoracic spine. Tr. 368.

8   Plaintiff also argues the ALJ erred in not setting forth any reason for rejecting those limitations Dr.
9   Stirling set forth in another state physical evaluation form he completed on December 17, 2001. Dr. Stirling
10  indicated in that form that plaintiff would be unable to perform sedentary work at least half-time. Tr. 218.
11  Again, however, Dr. Stirling believed plaintiff would be so limited for a period of only twenty-four weeks,
12  felt treatment was likely to restore his ability to perform work at least half-time, and found no indications of
13  limitation on agility, mobility or flexibility. Id. Indeed, Dr. Stirling examined plaintiff two days later, finding
14  little more than some tenderness on range of motion. Tr. 303. Thus, in light of this and the other objective
15  medical evidence in the record discussed above, the ALJ did not err in failing to specifically reject this
16  evaluation form.[1] Vincent, 739 F.3d 1393 at 1394-95 (ALJ must only explain why significant probative
17  evidence has been rejected).

18  Plaintiff next objects to the ALJ's rejection of Dr. Spirling's June 2001 opinion based on plaintiff's
19  own self-reports. Plaintiff argues this basis for rejecting Dr. Spirling's opinion is erroneous, because once a
20  claimant establishes the presence of a medically-determinable impairment that would be expected to cause
21  pain, an ALJ may not reject the claimant's testimony regarding his limitations based on a lack of objective
22  medical evidence. It is true that an ALJ cannot reject a claimant's pain testimony solely on the basis of a
23  lack of objective medical evidence in the record. See Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995)

---

[1] Plaintiff has, in addition, referred to two other state physical evaluation forms that Dr. Stirling completed in late March 2002 (Tr. 404-05), and late February 2003 (Tr. 408-09). In those forms, Dr. Spirling again assessed plaintiff with work limitations, including limiting him to less than full-time sedentary work. Both of these forms, however, were submitted for the first time to the Appeals Council, not to the ALJ. Thus, the ALJ did not have the opportunity to review them. Plaintiff, furthermore, has not set forth any reason why the court should now review that evidence. Indeed, it is not at all clear that this court has the authority to do so without a showing of "good cause" by plaintiff. See Mayes v. Massanari, 276 F.3d 453, 461-63 (9th Cir. 2001) (stating that issue of whether "good cause" is required to review new evidence submitted for the first time to the Appeals Council has not yet been decided). The court, therefore, declines to consider either evaluation form.

REPORT AND RECOMMENDATION
Page - 8

1  (once claimant produces medical evidence of underlying impairment which is reasonably likely to cause
2  some pain, ALJ may not discredit claimant's pain testimony solely because degree of pain alleged is not
3  supported by objective medical evidence). As explained below, however, this was only one of the reasons
4  the ALJ properly discounted plaintiff's credibility.

5       In addition, the ALJ may disregard a medical opinion, even that of a treating physician, when that
6  opinion is premised on a claimant's symptom complaints, and the record supports the ALJ in discounting
7  those complaints. Tonapetyan, 242 F.3d at 1149; see also Morgan, 169 F.3d at 601; (physician's opinion
8  premised to large extent on claimant's complaints may be disregarded where those complaints have been
9  properly discounted). Here, as discussed below, the evidence in the record, both medical and otherwise,
10 supports the ALJ's findings regarding plaintiff's credibility.

11      In addition, it does appear Dr. Spirling based his opinion that plaintiff could not work full-time on
12 plaintiff's own self-reports. On the same day Dr. Spirling completed the June 18, 2001 state evaluation
13 form, plaintiff told him that although he could "do the work," he would not be able to do so "for the time
14 necessary to actually hold down a job." Tr. 215. As discussed above, Dr. Spirling's examination reports,
15 and the record as a whole, contain very little in the way of objective medical evidence to support such a
16 finding. The ALJ, therefore, did not err in rejecting that opinion based on both a lack of objective medical
17 evidence in the record and because of Dr. Spirling's reliance on plaintiff's self-reports.

18      B.    Dr. Newell-Eggert

19      Plaintiff argues the ALJ erred in rejecting Dr. Newell-Eggert's assessment of plaintiff's limitations
20 contained in a state physical evaluation form she completed on June 3, 2002. In that form, Dr. Newell-
21 Eggert assessed plaintiff's ability to work at least half-time in a normal day to day work setting as ranging
22 from severely limited (i.e., unable to lift at least two pounds or unable to stand and/or walk) to able to
23 perform sedentary work. Tr. 366. The ALJ rejected that assessment because Dr. Newell-Eggert provided
24 "little information" in that form "other than noting sedentary limitations." Tr. 27. First, it is not clear, as
25 plaintiff asserts, that Dr. Newell-Eggert limited plaintiff to less than sedentary work. Rather, as noted
26 above, it appears that sedentary work was the maximum level at which she felt plaintiff was capable of
27 performing. Irregardless, in light of the weight of the objective medical evidence in the record discussed
28 above, the ALJ did not err in rejecting her opinion for lack of such evidence. Indeed, none of Dr. Newell-

REPORT AND RECOMMENDATION
Page - 9

1  Eggert's own examination reports revealed any significant abnormalities. Tr. 334-35, 339-41, 368-69.

2      C.    <u>Dr. Smith</u>

3  Plaintiff next argues the ALJ failed to note the assessment of limitations Dr. Smith provided in a
4  state physical evaluation form he completed on January 10, 2001. Plaintiff asserts that this assessment, in
5  which Dr. Smith found plaintiff severely limited in his ability to perform work at least half-time, supports a
6  finding of disability. Tr. 198. While it is true the ALJ did not specifically mention the January 10, 2001
7  evaluation form in his opinion, the ALJ did note Dr. Smith's subsequent examination findings indicated only
8  "mild" symptoms at best. Tr. 21, 27.

9  Indeed, in focusing solely on the January 10, 2001 evaluation form, plaintiff has ignored the three
10 examinations Dr. Smith performed more than nine months later, all of which found no specific anatomic
11 abnormality. <u>See</u> Tr. 281-86. Thus, none of those examination reports even comes close to supporting Dr.
12 Smith's earlier opinion. <u>See</u> Tr. 281-86. In addition, even if it could be said Dr. Smith's later findings did
13 support his earlier opinion, that opinion estimated that plaintiff would be so limited for a period of only
14 twenty-six weeks, and further noted that plaintiff's problem was <u>not</u> orthopedic and that treatment had not
15 yet been started. Tr. 198. Thus, the ALJ properly did not adopt that opinion.

16     D.    <u>Dr. Meagher and Dr. Wingate</u>

17 Lastly, plaintiff argues the ALJ erred in not finding plaintiff disabled based on the reports of two of
18 plaintiff's examining psychologists, Christopher Meagher, Ph.D., and Terilee Wingate, Ph.D. With respect
19 to those reports, the ALJ found in relevant part as follows:

20 > The undersigned has considered the medical opinions of record related to the claimant's mental impairments. Dr. Wingate and Dr. Trowbridge evaluated the claimant for
21 > purposes of state assistance and completed checklist forms. Dr. Wingate diagnosed a major depressive disorder and a pain disorder associated with both psychological factors
22 > and a general medical condition. However, she indicated that depression is treatable and she recommended antidepressant medication. She noted mild to moderate limitations
23 > but only for a limited time of not more than six months. Dr. Trowbridge found generally mild limitations in functioning, with moderate limitations in the claimant's ability to
24 > relate to coworkers and supervisors and his ability to respond appropriately to work stress. He also recommended mental health treatment. While the undersigned has
25 > considered these opinions, greater weight is accorded to the opinion of the consultative examiner, Dr. Meagher, who provided a comprehensive psychological evaluation report
26 > in support of his opinion. Dr. Meagher noted that the claimant's chronic pain was primarily related to his medical condition, but he had some secondary psychological
27 > concomitants that were typical of the stress associated with chronic conditions. Dr. Meagher offered opinions regarding the claimant's physical impairments and treatment,
28 > which are beyond his area of expertise and are not accorded weight. However, he indicated that the claimant's psychological impairments were mild and opined that the

REPORT AND RECOMMENDATION
Page - 10

        claimant had no more than mild limitations in his functioning as a result of his mental impairments.

Tr. 29.  In so finding, the ALJ did not err for the reasons set forth below.

        Plaintiff argues that the findings of Dr. Meagher and Dr. Wingate indicate plaintiff is significantly limited.  The undersigned disagrees.  First, while Dr. Wingate did find plaintiff to be moderately limited in a number of functional areas, as noted by the ALJ, she stated that plaintiff's depression was treatable and that he would be so limited for no more than six months. Tr. 240-41.  Dr. Trowbridge also felt mental health treatment was likely to restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner. Tr. 253.

        With respect to Dr. Meagher, it is true that he did state that plaintiff's current level of functioning appeared to be notably compromised. Tr. 380.  However, he too felt that plaintiff's symptoms could be "mitigated" with appropriate treatment involving "additional conservative measures." Id.  He further noted that plaintiff's psychological issues were secondary to his general medical condition, and that there were "insufficient indications" to suggest that plaintiff's symptoms were "primarily psychogenic or somatoform in character." Id.

        Plaintiff argues Dr. Meagher's findings were consistent with the moderate limitations found by Dr. Wingate.  As discussed above, however, Dr. Wingate felt that plaintiff would be so limited for a period of at most six months.  In addition, a reading of the narrative report provided by Dr. Meagher does not show any such consistency.  Indeed, in a medical source statement of ability to do work-related mental activities Dr. Meagher filled out at the same time he wrote his narrative report, he noted at most "slight" limitations, and again found plaintiff's primary impairments to be physical and his psychological impairments to be "mild and secondary." Tr. 381-82.

        Plaintiff nevertheless asserts the medical source statement, a "check box" form, is inconsistent with Dr. Meagher's narrative report findings.  However, the only "inconsistency" plaintiff points to is the global assessment of functioning score, which Dr. Meagher rated as being a "60." Tr. 380.  As discussed above, furthermore, Dr. Meagher stated in his narrative report that plaintiff's impairments were not primarily psychogenic, and the treatment program he recommended focused for the most part on pain management and physical therapy. Id.  In any event, to the extent there is any ambiguity in Dr. Meagher's findings as to whether or not he believed plaintiff's mental impairments were more than mild, it is solely the ALJ's duty to

REPORT AND RECOMMENDATION
Page - 11

resolve that ambiguity. See Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.

Lastly, plaintiff argues the ALJ erred in discounting Dr. Meagher's opinions regarding the nature and extent of plaintiff's physical limitations as those opinions are outside his area of expertise. Plaintiff asserts that because Dr. Meagher is a specialist in pain disorders, he is precisely the source to provide an assessment of how plaintiff's physical and mental impairments together affect his functioning. However, since Dr. Meagher is not a medical doctor, it was not improper for the ALJ to decline to adopt his physical impairment findings in favor of those objective medical findings from other sources in the record who are licensed to practice medicine.

II.   The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part because the objective medical evidence in the

REPORT AND RECOMMENDATION
Page - 12

1  record did not fully support his allegations of total disability. Tr. 25-26.  A finding that a claimant's

2  symptom complaints are "inconsistent with clinical observations" can satisfy the clear and convincing

3  requirement. <u>Regennitter v. Commissioner of SSA</u>, 166 F.3d 1294, 1297 (9th Cir. 1998).  Plaintiff argues

4  the ALJ erred in so finding by failing to recognize the significance of his "pain disorder."  In so arguing,

5  plaintiff relies on the diagnosis of chronic pain disorder provided by Dr. Meagher.  As discussed above,

6  however, the ALJ did not err in evaluating Dr. Meagher's opinions or the other medical evidence in the

7  record.  Thus, she did not err in discounting plaintiff's credibility for this reason.

8      The ALJ next discounted plaintiff's credibility for the following reason:

> The claimant testified that he has overwhelming pain.  However, the claimant's activities are not consistent with the severity of his reports of symptoms.  Although the claimant experiences some pain as a result of the combination of all of his impairments, he remains able to perform a wide range of activities.  He has reported an ability to walk, to do errands, shop, cook, do light chores, use the bus, drive a car with a manual transmission, handle his finances, and visit occasionally with friends. (Exhibits 24F/3, 6E/2-3, 16D/4, 18F/3).

13  Tr. 26.  Plaintiff challenges this finding, stating that the ALJ failed to explain how these activities were not

14  consistent with his allegations of disability.  This argument, however, is without merit.

15      To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her

16  daily activities. <u>Smolen</u>, 80 F.3d at 1284.  Such testimony may be rejected if he or she "is able to spend a

17  substantial part of his or her day performing <u>household chores or other activities that are transferable to a

18  work setting</u>." <u>Id.</u> at 1284 n.7 (emphasis added).  Thus, the ALJ certainly may consider plaintiff's ability to

19  do such activities as cooking, shopping and other household chores.  Plaintiff cites to no authority for the

20  proposition that an ALJ has to explain how every activity a claimant can perform is transferable to a work

21  setting.  Indeed, at least with respect to his reported ability to walk, plaintiff cannot seriously contend that

22  such an ability has no bearing on whether he is disabled or can work.

23      The ALJ also discounted plaintiff's credibility because he "performed various work activities after

24  his alleged onset day of January 1, 1994[2][,] including handyman work, odd jobs such as cleaning carports,

25  and work as a stocker and cashier."  Tr. 26.  An ALJ may consider a claimant's work record. <u>Smolen</u>, 80

26  F.3d at 1284.  Plaintiff argues that none of these jobs rose to the level of substantial gainful activity, and

27

28      [2]Although plaintiff amended his onset date of disability to November 13, 2000, he did not do so until after the ALJ issued her decision.  Tr. 388.  Thus, it was not improper for the ALJ to consider the period between January 1994 and November 2000.

REPORT AND RECOMMENDATION
Page - 13

thus are not inconsistent with a finding of disability. However, the ALJ was not relying on plaintiff's work activity to find him disabled. Indeed, the ALJ expressly stated that although plaintiff "did not perform these activities at levels required for a finding of substantial gainful activity," they "indicate an ability to perform significant work tasks." Tr. 26. As such, plaintiff's ability to engage in work activities, even of short duration, is relevant to his credibility determination. Thus, the ALJ did not err here.

The ALJ further discounted plaintiff's credibility in part because the medical evidence in the record indicated his pain responded well to prednisone and that his condition in general was managed on a low dose of that medication. Tr. 26. Plaintiff objects to this reason because he never has been in a period of "remission," and because his symptoms have been only "somewhat" relieved by medication. However, the medical evidence in the record indicates otherwise. In late November 2000, Dr. Williams noted plaintiff's symptoms had "resolved within 24 hours of starting" prednisone. Tr. 193. In mid-December 2000, he again found plaintiff to be "doing fine" on prednisone. Id. In late Februay 2001, Dr. Jensen also observed that the prednisone had "resolved the pain," and that plaintiff's inflammatory symptoms "responded well to corticosteroids." Tr. 226-27. In late March 2002, Dr. Stirling reported that low doses of prednisone had been "successful" in relieving plaintiff's symptoms. Tr. 302.

Finally, plaintiff argues that his failure to follow through with "some treatment recommendations" is not a clear and convincing reason for discounting his credibility. However, the failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). On the other hand, if the claimant provides evidence of a good reason for not taking medication, his symptom testimony cannot be rejected because he failed to do so. Smolen, 80 F.3d at 1284. Here, the ALJ found as follows:

> It is also noted that the claimant has not been fully compliant with recommended treatment. For example, Dr. Ehlers recommended compression stockings and exercise twice a day to help with his varicose veins. However, the claimant does not use compression stockings and there is no indication that he exercises twice a day as recommended. There is also no indication in the record that he returned to see Dr. Ehlers regarding surgical options as recommended if conservative treatment was not effective. Also, it does not appear that the claimant pursued epidural injections, which were offered to him for his back. The claimant has reported constant elbow pain, but he did not obtain a neoprene brace prescribed by his doctor. The claimant's failure to follow recommended treatment or pursue treatment options reflects adversely on the reliability of his reports regarding the severity of his symptoms.

REPORT AND RECOMMENDATION
Page - 14

Tr. 26.  The ALJ also noted that although plaintiff reported improvement in his depressive symptoms on medication, he stopped taking it and "later declined mental health treatment and medication, which would likely improve his symptoms." Tr. 29.  While the above recommendations may not have encompassed <u>all</u> of the recommendations plaintiff's physicians made, his failure to follow these recommendations certainly is sufficient to cast doubt on his credibility.  In sum, then, the undersigned finds that the ALJ did not err in discrediting plaintiff's pain and symptom testimony.

III.    <u>The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity</u>

If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work. <u>Id.</u> at *2.  It is what the claimant "can still do despite his or her limitations." <u>Id.</u>

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." <u>Id.</u> at *7.

The ALJ assessed plaintiff with the following residual functional capacity:

> [T]he claimant retains the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours total in an eight hour workday with normal work breaks: and stand and/or walk for six hours total in an eight hour workday with normal work breaks.  He can kneel, crouch, crawl, climb, and reach overhead on an occasional basis and can balance and stoop on a frequent basis.  In addition, the claimant is limited to work involving simple routine one and two step tasks that require only occasional contact with the public and coworkers.

Tr. 30.  Plaintiff argues the ALJ erred in assessing plaintiff with the above residual functional capacity because: (1) that assessment was not consistent with the opinions of Drs. Stirling, Newell-Eggert, Smith and Wingate; and (2) the ALJ did not provide clear and convincing reasons for discounting plaintiff's credibility.  As discussed above, however, the ALJ did not err in evaluating the medical evidence in the

record or in discounting plaintiff's credibility.

Plaintiff also argues the ALJ erred in finding that his ability to walk and/or stand for a total of six hours in an eight-hour workday with normal work breaks every two hours was not inconsistent with the medical recommendations of Dr. Ehlers. See Tr. 28. In a letter to Dr. Stirling, dated August 20, 2002, Dr. Ehlers stated that she instructed plaintiff "to start using compression stockings, to begin an exercise regimen of walking at least twenty minutes twice a day, to elevate his legs when he is at rest, and to avoid prolonged sitting and standing." Tr. 329. However, as the ALJ noted, Dr. Ehlers only stated that plaintiff should elevate his legs while at rest, not while working. Tr. 28. In addition, as discussed above, the ALJ did not err in discounting plaintiff's credibility for not following through with Dr. Ehlers' recommendation to use compression stocking and to exercise twice a day. Thus, the ALJ cannot be faulted for declining to adopt Dr. Ehlers' restrictions on prolonged standing.

Dr. Ehlers, furthermore, provided no accompanying objective medical findings that would support functional restrictions greater than that found by the ALJ. Indeed, the non-examining consulting physician, Dr. Harold Mayor, provided a residual functional capacity assessment consistent with that provided by the ALJ. Tr. 245-48. Plaintiff argues this opinion should be discounted because it was made in August 2001, and thus did not take into account much of the medical evidence that was later made available to the ALJ. As discussed above, however, the vast majority of that evidence failed to indicate the presence of any significant abnormality or impairment that would result in disabling limitations. Accordingly, the ALJ did not err in adopting the residual functional capacity assessment that she did.

IV.  The ALJ Properly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (because ALJ included all limitations that he found to exist, and those findings were supported by substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

Here, the ALJ relied on the testimony of the vocational expert to find that there were a significant number of jobs existing in the national economy that plaintiff could perform. Tr. 31. Plaintiff argues that the vocational expert testified that an individual who had the limitations described in Dr. Wingate's report would be unable to sustain employment. Again, however, as discussed above, the ALJ properly declined to adopt the moderate limitations found by Dr. Wingate. As such, he did not err in finding plaintiff to be not disabled at step five of the disability evaluation process.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 8, 2005**, as noted in the caption.

DATED this 10th day of June, 2005.

Karen L. Strombom
United States Magistrate Judge